## Case No. 8,733.

### McCREADY et al. v. HOLMES.

[6 Am. Law Reg. 229.]

District Court, E. D. South Carolina. Oct., 1857.

CARRIERS — QUANTITY OF GOODS SHIPPED — BILL OF LADING—RECEIPT OF CONSIGNEE—BURDEN OF PROOF.

Though a carrier, in the absence of evidence of fraud or mistake, is concluded by the receipt in his bill of lading, as to the quantity or amount of the goods shipped; yet, in an action for the freight, where the consignee has received the goods, at the wharf, without qualification or reservation of the right to inspect, weigh, or measure them, and the carrier proves due care of them during the transit, and an actual delivery of all in his possession on his arrival, the burden of proof is on the consignee to establish that a deficiency in the quantity specified in the bill of lading, afterwards discovered, is chargeable to the wrongful act or neglect of the carrier.

[Cited in Robinson v. Memphis & C. R. Co., 9 Fed. 139.]

Libel in admiralty, in personam [by McCready, Motte & Co. against R. L. and W. E. Holmes].

Edward McCready, for libellants.
C. H. Simonton, for respondents.

MAGRATH, District Judge. The libel in this case, is filed to recover a balance of freight, for the transportation of one hundred tons of coal from Philadelphia to Charleston. The vessel arrived at Charleston, and the coal was delivered to the respondents, the consignees: who with their carts carried it to the office of the public weigher; and by his weight, it appeared there was a deficiency of several tons. The respondents claim a deduction from the freight, of so much as is alleged to be the value of the coal which has been lost. It is conceded that a certain percentage (2½) of loss, is usually allowed. The libellants concede this allowance, and charge freight for 97½ tons; but insist that no other deduction should be made. The cartmen employed by the respondents depose that they carted to the public weigher all the coal they received: and the libellants prove that all the coal received in Philadelphia was brought to Charleston, and delivered to the respondents. A carrier is responsible to the consignee for the safe delivery of property committed to his care. Ordinarily, the bill of lading determines the nature of his liability. When by the execution of that paper he has admitted his possession of the property of another, it is conclusive against him, unless upon proof of inadvertence, mistake, or deceit. That the carrier did not supervise the process by which the weight was ascertained; or that he signed a bill of lading upon a representation which he did not verify, are suggestions to which I would reluctantly listen, if offered to qualify a liability plainly expressed in the bill of lading. No sufficient reason in this case is presented to me for doubting the correctness of the weight as ascertained in Philadelphia, and I hold the libellants concluded by it. The libellants being thus liable for the safe delivery of the property subject to such exceptions, as by custom or contract qualify that liability, can discharge themselves by showing a performance of their undertaking. This they do, by proof that all the coal received at Philadelphia was duly cared for while being laden; that all precautions were taken to secure it from loss by theft or otherwise; and that all the coal in the vessel was delivered to the respondents.

The undertaking of a carrier is affected by the nature of the property he may have in his custody. If its value is determined by measure, weight, or any other test, his liability depends upon the result of an application of that test, at the port of delivery, under such circumstances as I shall notice. But the consignee may not require the test.

He may be satisfied, and willing to receive his consignment without the delay, trouble, and expense of ascertaining whether it corresponds with fractional accuracy to that specified in the bill of lading. A delivery and acceptance of this kind would not conclude the consignee in case of loss or damage subsequently ascertained; but it would increase the difficulty of making a carrier liable for loss or damage, (as in this case by a diminution in quantity) ascertained after the carrier had parted with his possession; and by an examination made without his knowledge or presence. And if it should be, that after the carrier had parted with his possession of the property, it has been in the possession and control of other agents of the consignee; the reason for exonerating the carrier increases in proportion to the number of such agents, the length of time for which they were in possession; and the opportunities they enjoyed to diminish the quantity for which the carrier was liable. In this case, the carrier received one hundred tons of coal, and became bound for its delivery. That delivery must be so made as to admit an ascertainment by the consignee, of the fidelity with which the contract of the carrier has been performed. It is not the duty of the carrier to weigh, measure, or inspect property, before he delivers it to the consignee; but it is a right in the consignee to ascertain whether the quantity or quality of the property, which the carrier has had in his charge, has been lessened or impaired, while it was in the possession of the carrier, and by causes for which he is liable. The consignee may therefore qualify his acceptance, by notice to the carrier that he intends to weigh, measure, or by any other appropriate test, ascertain if what he has received, is that which the carrier admitted that he had received, and agreed to deliver. And such notice would bind the carrier so that he would be concluded by the examination made in pursuance of it, unless he was able to show its insufficiency. If upon that examination, it appeared that there was a deficiency in quantity or diminution in value, which would have justified the consignee in refusing to receive the property, if known to him before he had received it, he still would have that right. And if the carrier acquiesced in the examination, he would have a right to supervise the transportation to the place of, and to be present at the examination; and there to enforce his lien as perfectly as he could have done, while the property was in the hold of his vessel. In such a case, the delivery on the one side, and the acceptance on the other, would be qualified, operating as a special agreement, under which the lien of the carrier may be preserved, and all the rights of both parties secured. No wrongful act of the consignee or owner can divest the lien of the carrier. Mont. 40; 3 McCord, 120. In England, if the goods are not to be landed at a particular wharf, the carrier may send them to a public wharf, and the possession of the wharfinger will support the lien of the carrier. Indeed, the corresponding rights of the carrier to his freight, secured by a lien on the cargo, and of the consignee to an inspection or examination of the property, have been understood and provided for, even in the earliest times. The Laws of Wisbuy, the Ordinance of Rotterdam, the Consolato del Mare, with some variations in the details, but an uniform recognition of the principle, make it the duty of the master not to detain the goods in the vessel, where they cannot be inspected, but to have them in some place where they may be examined. In England, it is said to be the practice, in cases where goods should be landed and warehoused, that the master may secure his lien by entering them in his own name. And the dock act of 39 Geo. III. c. 69, and 45 Geo. III. c. 58, expressly reserve the lien of the master. Chit. Carr. 312, and note. It may not be uninstructive, at least in this court, that we should bear in mind that here, the lien of the carrier is not only referred to the common law, by the strict rule of which, possession must accompany the lien; but it is also, that hypothecation implied in maritime contracts, and to the enforcement of which possession is not essential.

As the carrier has no right which is affected by the right of the consignee to this examination or inspection, of course he cannot refuse the consignee the full benefit of it. He has no right to insist that the consignee shall receive his property in any manner by which his claim for loss or damage may be made more difficult or embarrassing. He cannot enforce a delivery of property at improper times, or in bad weather, if the property cannot be secured by the consignee, or is exposed to damage during its transfer to the store. The consignee is entitled to reasonable notice, if he is known, of the arrival of the property, and to a fair opportunity of providing suitable means to carry it away safely. Story, Bailm. § 509; The Grafton [Case No. 5,656.] But the consignee has not the right to accept a delivery of the goods, commit them to his agents, examine them without notice to the carrier, and charge the carrier with a loss alleged to have been thus subsequently ascertained, upon such proof as excludes all reasonable probability of the loss having happened except in the hands of the carrier. By the French law, upon a delivery to the consignee, he must give a discharge to the carrier. 2 Boul. P. 318. If he refuses to receive the goods, or receives them and refuses to give a discharge, he renders himself liable in damages. If his refusal to receive the goods is upon the ground of damage, or other sufficient reason, by his application to the proper officer, qualified persons are named, who determine the suffi-

ciency of the cause alleged for the refusal to receive. Code de Commerce, art. 106; 2 Boul. P. 318. The depot and the transportation of the property are also ordered, and a sale, if necessary, to the amount of the freight due to the carrier. The right of the consignee to an examination before he accepts the property, is necessary, because acceptance and payment of freight extinguish all claim against the carrier. Code de Commerce, art. 105.

I have considered this question without reference to such modifications of the general principle as arise from general custom, local usage, or special contract. They afford the rule in all cases in which they occur. I have not any evidence of either of these existing here, and the rule, as I have stated it, is the general law, unaffected by such qualifications as exist in certain places or in certain cases. Supposing, then, that the quantity of coal was correctly ascertained at Philadelphia, there is a deficiency as it is now in the hands of the consignee. But the evidence shows that the loss cannot be attributed to want of care, theft, or any other cause operating while in the vessel to diminish the quantity. There was some evidence of loss happening by the transfer of coal from the vessel to the wharf, but it was too indefinite to be the basis of any conclusion; nor, indeed, was it made to bear directly upon this case. It rather seemed to furnish the explanation of the usual allowance of 2½ per cent. loss. But the loss may have happened after the delivery to the consignee. The coal was carted, after it was landed, to some distance, and then weighed. The carts were under the control of the agents of the consignee. It is quite as reasonable to infer that the loss happened while the coal was under the care of the agents of the consignee, as while it was under the charge of the carrier. If the consignee had notified the carrier of his intention to have the coal weighed by a public weigher. it would have been proper in the carrier, affected as he would have been by all that was done under such a notice, to watch the transportation of the coal, and to be present when it was weighed. But, without such notice, the carrier had no reason to suppose that the coal was to be reweighed to decide his liability, particularly when, according to the evidence of the public weigher, there is no uniformity in the practice, and that coal is often received by the consignees without this test.

The postponement of the ascertainment of the liability of the carrier, without prejudice to the consignee; and the preservation also of the rights of the carrier, are embraced in the rule that, "if a person is apprehensive of losing a right by any event, it may be advisable and necessary for him to protect himself, either by protesting against a prejudicial interpretation of the event, or by reserving his rights." Lindl. Jur. 142. And although not strictly analogous, yet the principle which by the custom of London applies to the vessel at quarantine, illustrates the preservation of the mutual rights of the carrier and consignee, although the carrier has parted with the property, and it is in the possession of the consignee. In the case of a vessel at quarantine at London, the consignee, at his own expense and risk, sends for the goods; and the packing and care of the goods in the transit to the wharf devolve upon the consignee. Chit. Carr. 265. The delivery does not determine the liability of the carrier altogether, nor will it divest his lien. But in the transportation from the only place where a delivery can be made, to the place in which an examination can be had, the risk of loss or damage is with the consignee. So in this case, the carrier has landed the coal; and at the wharf, made delivery of it to the consignee. The consignee intending to cart it elsewhere, and to weigh it, must do so at his own expense and risk. If loss or damage occurs in that transportation, the consignee must bear it.

I have sufficiently expressed the opinion, that although the mere transit was ended by delivery at the wharf, yet that acceptance there did not necessarily extinguish the liability of the carrier. The delivery must be such as enables the consignee to ascertain, if he desires, how far the contract of the carrier has been performed; it must be such as allows the consignee safely to receive and properly to examine what has been delivered. If the consignee, without notice or qualifying his acceptance, receive, as in this case, coal; commits it to his agents, in whose charge it may be lost, as well at least as while it was in the charge of the carrier; and rests the proof of loss by the carrier upon evidence which does not render it more probable that the loss was chargeable to the carrier, than to his own agents,—a case is presented in which I am not at liberty to make the carrier liable.

The decree will be entered in favor of the libellants for the freight unpaid, and the costs.